Michael F. **BROCK, Edgar L. Brock, Jr., Jennifer Brock Martin and Bradford A. Brock, Individually and as Children of Edgar Lloyd Brock, Plaintiffs,**

v.

**WARREN COUNTY, TENNESSEE, Warren County Sheriff's Department, Billy Delaney, Sheriff Kenny Taylor, and Warren County Commission, composed of Maurice B. Blair, Jimmy G. Blankenship, Janice S. Breedlove, Arthur Brown, Elizabeth Chastain, George Christian, Harry T. Dunn, Douglas W. Grissom, Lowell Haston, Richard Hobbs, Joe L. Kuhn, Harold Laws, Bob C. Mason, Melvin Maxwell, Ernest Morton, Harold McGee, Kenny Neal, Huston Prater, Frank Rice, Jerry W. Roberts, Jerry Stubblefield, William E. Ward, Bill Zechman, and L. Ray Moore, Defendants.**

Civ. No. 4–87–057.

United States District Court,
E.D. Tennessee,
Winchester Division.

April 11, 1989.

---

Hal D. Hardin, Nashville, Tenn., for plaintiffs.

Richard Ruth, Jr., Chattanooga, Tenn., for defendants.

## MEMORANDUM OPINION

JARVIS, District Judge.

This is an action brought by the children of Edgar Lloyd Brock ("Brock") pursuant to 42 U.S.C. § 1983 and the Tennessee

wrongful death statute, T.C.A. § 20–5–101, *et seq.*, for the death of their father. Mr. Brock was a convicted prisoner who was an inmate in the Warren County Jail from July 3 until the early morning of July 9, 1986. He died on July 21, 1986 from heat prostration suffered while he was housed in the jail. This matter was tried on March 21 and 22, 1989 before the undersigned without intervention of a jury. The following constitutes this court's findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

### I. *Findings of Fact*

1. Plaintiffs' decedent was 62 years of age when he was incarcerated in the Warren County Jail in early July, 1986. At the time he first entered the jail on July 3, Mr. Brock was in general good health although he was a borderline diabetic whose condition was controlled by oral medication and he was overweight. Prior to entering the jail he was in the business of making antique picture frames from which he earned approximately $250 to $350 per month. It is undisputed that plaintiffs' decedent was not a dangerous or violent prisoner.

2. At the time of Mr. Brock's incarceration, the official responsible for maintenance of the jail was Sheriff Billy Delaney. Funds for maintenance and improvements in the jail were provided for by the Warren County Commission, to which Sheriff Delaney turned for operating funds. Prior to Mr. Brock's incarceration, the living conditions in the jail were the subject of considerable discussion between Sheriff Delaney and the County Commission. In 1983 the jail had been the subject of another lawsuit in this court, *George E. Penland, et al., v. Warren County Jail, et al.,* Civ. 4–82–09 (June 21, 1983), which resulted in an order by this court which, *inter alia,* ordered the following relief:

> . . . . .
>
> (2) that the defendants devise a comprehensive health care plan providing for weekly sick call, training of staff, follow-up care, and organized medical files, supervised by a registered nurse or other medical professional;
>
> . . . . .

Sheriff Delaney was aware of this order as were the members of the Warren County Commission. In spite of the order in *Penland,* no medical training was provided to jail personnel.

During the years that Delaney was responsible for the jail, the State of Tennessee repeatedly threatened to revoke the jail's certification unless improvements were made in the living conditions. Sheriff Delaney testified that he told members of the Warren County Commission that people could possibly die in the jail because of the environmental conditions and the response of the Commission was, "We just don't have the money."

An inspection of the jail was performed by an officer from the Tennessee Corrections Institute on May 7, 1986. The jail was certified at that time. However, the following problems were noted:

> Finally, Warren County is a well maintained facility. There is a problem with possible over-crowding. There is also a problem with ventilation and temperature control. On the day of the inspection the temperature was hot but, not too hot; however, on an extremely hot day this could cause a problem. Hopefully, Warren County has/is prepared for the hot months ahead.

Ex. 5, at p. 5. Thus, this report clearly forewarned the defendants of ventilation and heat problems which could occur during the summer months.

3. During the six days of plaintiffs' decedent's incarceration in the jail, Warren County was undergoing a severe heat wave. For the vast majority of his stay in the jail, Mr. Brock was housed in, by all accounts, the jail's hottest place, a cell known as Cell 1505. Cell 1505 was a seven-man cell consisting of one large room containing a table, a commode, a shower and seven bunks. The cell was not air conditioned, it was totally enclosed, and it had no bars. It contained a steel door with a diamond-shaped window and a pan hole which was used to pass food to the inmates. The pan hole was the only escape for air in the cell. The sole window in Cell

1505 was approximately 18 by 24 inches in size, was located on the outside wall of the cell, and was covered by a steel plate during the time that Mr. Brock was incarcerated.

Cell 1505 and the remaining cells in the jail contained air conditioning ducts but were not furnished with an air conditioning unit as were other areas of the jail. Cell 1505 did have a vent in the ceiling for ventilation purposes, but the proof showed that the vent was not operational while Mr. Brock was incarcerated.

There is no question that during Mr. Brock's stay in the jail ventilation in Cell 1505 was virtually nonexistent. The temperature and humidity in the cell were extremely high. An inmate named Ronnie Lee who was in Cell 1505 with Mr. Brock testified that when one returned to the cell from in the hall and the door was opened, hot air rushed out into the hall "like it was coming from an oven". This observation was confirmed by the testimony of jail guards. Several inmates in the cell, including Mr. Brock, developed heat rashes and complained about the heat to jail guards. At one point an inmate named Johnny Parish fainted from the heat. By deposition, Sheriff Delaney testified that he had told the commissioners that the jail was not fit to house prisoners during the summer. *See* Deposition of Billy Delaney, at p. 19.

Due to the heat, the inmates in Cell 1505 took frequent cold showers which contributed to extremely high humidity in the cell. The humidity was high enough to result in the condensation of water on the inside walls of the cell which dripped onto the floor. A jail guard testified that he would only put his pet cat in Cell 1505 if "the cat had rabies." *See* Deposition of James Austin, at p. 37. Another jailer, Deputy Glen Rhea, testified that the thermometer in the hallway near Cell 1505 read as high as 110 degrees during the day and as high as 103 degrees to 104 degrees at night, and that it was cooler in the hallway than it was in Cell 1505. He further testified that he had conversations with Delaney concerning the heat and ventilation problems and that the Sheriff advised him that there was nothing he could do because the Warren County Commission could not afford the necessary funds.

4. Shortly after Mr. Brock was confined in the cell, Sheriff Delaney was aware that he was having difficulty breathing because occasionally Mr. Brock was brought up to sit on the couch in an air conditioned lobby. A nurse occasionally visited the jail and on July 8th Mr. Brock was seen by the nurse due to sickness in his stomach, weakness and pain in his back. The nurse's report shows that at that time Mr. Brock had a temperature of 100.4 degrees, a pulse of 114, and blood pressure of 160/90. The nurse noted that Mr. Brock's skin was "warm-wet", that he had a rash over most of his body and that heat was a possible cause. The nurse talked to the Sheriff's Department's dispatcher about obtaining a fan or cooler area in which to house Mr. Brock and suggested that he be observed. These recommendations were not followed. In the late evening of July 8 and early morning of July 9, Mr. Brock stayed up for much of the night and became delirious. His cellmates managed to get the attention of the guard on duty but were told that nothing could be done since he was the only guard on duty at the time. At approximately 5:00 a.m. on July 9, Mr. Brock passed out. At approximately 5:45 a.m. to 6:00 a.m. Mr. Brock was removed by guards from Cell 1505 and placed in the hallway. No one administered any first aid to Mr. Brock. He was then carried upstairs in a blanket and placed in the back of a pick-up truck for transportation to the hospital. Mr. Brock arrived at the hospital's emergency room at 6:55 a.m. Hospital records show that he was unresponsive to pain and hot to the touch with a rectal temperature of 108.1 degrees. He was diagnosed as having sustained a heat stroke. As a result, Mr. Brock died on July 21, 1986 from consequences of the heat stroke, including renal and liver failure.

5. Within a day or two after Mr. Brock was taken to the hospital, Officer Rhea, at the direction of Sheriff Delaney, personally removed the metal covering over the window in Cell 1505, and this allowed better ventilation. In addition, a large fan was

borrowed from the Rescue Squad and placed in the hallway after Mr. Brock's collapse. These steps could have been taken earlier and neither involved the expenditure of any money.

■ 6. The court finds that the conditions in Cell 1505 were inhumane while Mr. Brock was housed there, and that the Sheriff and County Commission members were aware of the existence of those conditions. The court further finds that defendants' conduct in housing Mr. Brock in Cell 1505 under the conditions known to exist constitutes wanton and unnecessary infliction of pain and is grossly disproportionate to the severity of the crime warranting imprisonment.

■ 7. The court further finds that the county commissioners and the Sheriff failed to provide even minimal medical training to the jail guards and that this constituted deliberate indifference to Mr. Brock's serious medical needs.

8. The court finds that the defendants' failure to house Mr. Brock in a habitable cell and failure to provide adequate training for the jail guards were proximate causes of the death of plaintiffs' decedent.

9. The court finds no proof that the present sheriff, Kenny Taylor, played any part in Mr. Brock's death. The court further finds that the action against the individual members of the Warren County Commission is brought against them in their official capacities as county commissioners.[1]

10. At the time of his death, plaintiffs' decedent had a life expectancy of from 16 to 21 years, and he received $491 per month from a VA pension and $250 to $350 per month from the sale of picture frames.

11. The court fixes plaintiffs' compensatory damages at $100,000.00, including recovery for the pecuniary value of plaintiffs'

decedent's life, as well as pain and suffering. The court further finds that defendants' actions demonstrate a reckless and callous indifference to plaintiffs' decedent's constitutional rights and warrant the imposition of $10,000.00 in punitive damages against defendant Delaney.

## II. *Conclusions of Law*

1. The Eighth Amendment to the United States Constitution, among other things, protects convicted prisoners against cruel and unusual punishment. The conditions of confinement "must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Whether conditions of confinement are cruel and unusual must be determined from the contemporary standards of civilized decency that currently prevail in society. *Id.* at 346, 101 S.Ct. at 2399. At a minimum, the Constitution requires the state to provide minimally adequate living space that includes "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." *Grubbs v. Bradley*, 552 F.Supp. 1052, 1122 (M.D.Tenn. 1982). "Constitutionally adequate housing is not denied simply by uncomfortable temperatures inside cells, unless it is shown that the situation endangers inmates' health." *Id.*, citing *Smith v. Sullivan*, 553 F.2d 373, 381 (5th Cir.1977).

2. With respect to provision of medical care to be accorded convicted prisoners, the following standard applies:

An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," *In re Kemmler*, 136 U.S. 436, 447 [10 S.Ct.

---

1. The court notes that the complaint does not specify whether the individual members of the Warren County Commission are sued in their official capacities, their individual capacities, or both. It does not appear that the individuals were served with process in this case. Nor were any of them represented by counsel other than the attorney who represented both the county

and Sheriff Delaney. Nor is there any proof in the record to indicate which, if any, of the commissioners might have been in favor of providing additional funds for the jail and were simply outvoted. Under the circumstances, the court assumes that this action is brought against the individual commissioners only in their official capacities as commissioners.

930, 933, 34 L.Ed. 519] (1890), the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.

... Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under Section 1983.

*Estelle v. Gamble,* 429 U.S. 97, 103–05, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). In this case, the defendants' failure to provide plaintiffs' decedent with adequate medical care constituted deliberate indifference to the serious medical needs of Mr. Brock. The court observes that this care might have been simply afforded by moving the plaintiffs' decedent, a non-dangerous 62–year–old man, to a cooler spot.

3. Sheriff Delaney was the chief supervisor in charge of the Warren County Jail. *See* T.C.A. § 8–8–201(3). Liability of supervisory personnel must be based on more than the right to control employees. Section 1983 liability will not be imposed solely upon the basis of *respondeat superior.* There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of an offending subordinate. *Hays v. Jefferson County,* 668 F.2d 869, 872–74 (6th Cir.1982). In the instant case, Sheriff Delaney directly participated in and knowingly acquiesced in the conduct which violated Mr. Brock's constitutional rights.

4. Warren County may be held liable under § 1983 only if the deprivation of Mr. Brock's constitutional rights were the result of municipal "custom" or "policy". *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The liability of the county under § 1983 "attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986). In spite of being warned, the commissioners in this case made no effort to rectify the excessive heat and lack of ventilation problem in the jail and specifically in Cell 1505. Given their knowledge of conditions, the commissioners' conduct shows a deliberate choice to follow a course of action of doing absolutely nothing to improve the heat situation or to provide jail personnel with any minimal training in recognizing serious health problems in inmates.

In § 1983 actions, a judgment against a public servant "in his official capacity" imposes liability on the entity he represents provided, of course, the public entity received notice and an opportunity to respond. *Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985). The county is liable for the commissioners' failure to provide sufficient funds for a habitable jail or training of guards and the Sheriff's failure to take rudimentary precautions to lower the temperature and/or humidity in Cell 1505.

5. The court fixes plaintiffs' compensatory damages at $100,000.00.

6. With respect to the defendants' failure to provide adequate training to the jail personnel, "where municipal policy-makers are confronted with an obvious need to train city personnel to avoid the violation of constitutional rights and they are deliberately indifferent to that need, the lack of necessary training may be appropriately considered a city 'policy' subjecting the city itself to liability under § 1983." *City of Canton v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The Sheriff and the commissioners in this case were deliberately indifferent to plaintiffs' decedent's constitutional rights in failing to provide minimal medical training to the jail guards.

7. Under § 1983, punitive damages are available in an appropriate case. Punitive damages may be assessed against an

individual under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). Delaney's conduct in this case demonstrates reckless and callous indifference to Mr. Brock's constitutional rights and justifies an award of $10,000.00 in punitive damages against Sheriff Delaney. Although Delaney argues that there was nothing he could do since funds were controlled by County Commission, there were remedial steps which Delaney could have taken to alleviate the adverse conditions which would not require any expenditure of money. A county or municipality is immune from liability for punitive damages under § 1983. *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

8. In actions under § 1983, this court has, in its discretion, authority to allow the prevailing party reasonable attorney fees as part of the costs. 42 U.S.C. § 1988. I am of the opinion that an award of attorney fees to plaintiffs is appropriate in this case. Within twenty (20) days from the date of this Opinion, plaintiffs' counsel should file with the court an itemized list of time and expenses incurred in pursuing this action.

9. Since the proof showed no involvement in the deprivation of Mr. Brock's rights, Sheriff Kenny Taylor is dismissed as a defendant. Since the "Warren County Commission" and the "Warren County Sheriff's Department" are not suable entities under § 1983, they will be dismissed as defendants. Since any further recovery under the Tennessee Wrongful Death Statute would be duplicative, the court need not, and does not, consider any pendent state law claims.

### III. *Conclusion*

In light of the foregoing, the court finds that plaintiffs are entitled to recover One Hundred Thousand Dollars ($100,000.00) against defendants Delaney and Warren County, jointly and severally, and Ten Thousand Dollars ($10,000.00) in punitive

damages against Sheriff Delaney. Plaintiffs are also entitled to recover reasonable attorney fees pursuant to 42 U.S.C. § 1988.

Order accordingly.